In 1991, the California Supreme Court in Nymar set what appeared to be a categorical rule when it said all things being equal, a lender owes no duty to a borrower. But that paradigm would shift within a year when that same court in Biley v. Arthur Young would state that if certain exceptions were met, the categorical rule is no longer applied. And very specifically what the court said is that where one acts beyond the scope of a party with limited or adverse interests to the other side, a duty can arise. And only a few years later, in Soderberg v. McKinney, the lower court would go even further and say that the exceptions in Arthur Young did not merely apply in the investment or the accountant context. And in this regard, over a relatively short period of time, the paradigm shifted. And in that way, the case below and the reasons for which it decided are less about Nymar than about the fact that Nymar simply doesn't apply in this case. In this case, an individual acting on behalf of the lender very specifically said, we are working for you. The appraisal that we're getting is all that you need. And in that regard, clearly distinguishing Nymar, that lender no longer said, we are at opposite ends of the spectrum from you. We have interests that are adverse to yours. They were, in all regards, one team. It is very much the idea of somebody saying to somebody else, you need not look in that room. I will tell you what's in it. Don't bother looking. Or even going so far as to say to somebody who has no knowledge of the mortgage industry, who was, by his own words, a first-time buyer, you don't need to do anything else. In that regard, this case is, in fact, less about the distinctions with Nymar than about the fact that a very clear duty arose here as a result of those representations. This is not, in that regard, then, a simple lender case. This is not a case of an appraisal that was offered by somebody else not to be used by the buyer in this case. Rather, this was a case where a very clear statement was made, one imbued or cloaked in words that we would consider vague or to which we would give other means. We don't really know what happened here. I mean, this is 12 v. 6, right? Correct, Your Honor. An answer wasn't filed. An answer wasn't even filed yet, right? An answer was never filed. So, in fact, what we have is, I think from our perspective, a rather eisegesic analysis by the court and by the defendant in this case as to the meaning of the word should. To give it its proper context, when the waiter comes out and says, you should try the veal, it borders on a sales pitch or, at best, a recommendation. When your parents say you should make your bed, they're invoking the wrath of God. And when a lender says, in response to the question, should I get an appraisal, no, no, no need. We're asking now to accept the court's impression based on its perspective and the argument of the lender that that should was a rather ambiguous statement, much like the waiter. Just a panoply of things the buyer could have done. Well, you can get another appraisal. You don't need to. But we'll never know that because we never heard from the witnesses, as the court noted here. This was a 12 v. 6 motion. We'll never know the meaning of the word should. So the question is, in the context of initial pleadings of a 12 v. 6 motion, should the court have said, should the court have said, the meaning that we will give to it is an unequivocal statement merely of potentialities. That he was free to gather another appraisal. He was free not to get one. Because certainly in the context in which those statements were made, that was not at all what was understood by Mr. McKinney. Are you going to need to prove reasonable reliance in this case? Ultimately, absolutely. As part of the question of whether or not there was inducement, the questions will be in the context of his knowledge, what were the specific words that were transmitted to him? What could he reasonably understand them to mean? What efforts did he take beyond the receipt of those words to apprise himself of the context in which they were being offered? What other information did he have that might have led him to go in a different direction? And there the problem is that even after they made those statements, when Mr. Tran said, no, no, no need. You're already paying for one. And the understanding that Mr. McKinney had then, later when Mr. Aguilar says to him, and I think equally ambiguous terms, it all came back okay. Mr. McKinney by that point didn't have an understanding, I'm sorry, Mr. Palmer, didn't have at that point a context other than the one with which he began. A first-time buyer is told an appraisal is being done. There's no reason to have a second appraisal. Why would you even ask for one? Nothing changes. Now, that, of course, is in a record not before any court, because as you correctly noted, this was a 12b-6. But the proposition that is set forth in the pleadings and in the second amended complaint, particularly on page 5 of the record of paragraph 17, is that in the context in which he got that information, he knew nothing else. And based upon that, never received any information that would have led him to believe that something was afoul until much later. In that regard, we think that the Court fundamentally erred, irrespective of the second question as to whether it should have allowed further amending of pleadings, but rather as to its characterization of that second amended complaint. We submit that it was sufficient to set forth at the pleading stage the question of whether or not the lender went beyond its traditional role. And in having so made statements to Mr. Palmer, took itself out of the role of somebody at the opposite end of a transaction, but instead created a collaborative venture in which we think that Nymark is less the rule than Soderbergh and Biling. You said you wanted to reserve three minutes, and there you are. Thank you. Thank you, Mr. Abraham. Good morning. Good morning, Your Honor. Second time this week. Jan Chilton. It's a pleasure to be here. Welcome back. Thank you. Pleasure to be recognized. I have four points to make, and I'll make them as quickly as possible. Context. And let me preface context with, yes, indeed, this was a 12B6 motion, but you don't get to an answer and you don't get to evidence without first pleading facts sufficient to state a claim upon which relief may be granted. So let's talk about context. Counsel, what more needed to be pledged? A representation that could reasonably be interpreted to be both false and a statement of fact. And I don't believe any of the statements here, particularly in light of the context in which they were uttered, could meet either of those criteria. To speak to the context for just a moment, this was a real estate transaction that had two parts, a purchase of real estate and a loan to finance the purchase. All of the representations occurred in the context of the finance transaction, not the sale transaction. And that's important because a buyer of real property has a professional who owes the buyer a fiduciary duty in connection with the sale. That's the real estate broker or agent. Is there a real estate agent or broker involved in this case? No. No. That's exactly my point. Mr. Palmer is not suing the person who owed him a fiduciary duty in connection with bargaining the sale price. He is suing the lender. I'm sorry. Counsel, perhaps the defendant here can assume the role of what would ordinarily be the job of the broker. Excuse me, Your Honor. Perhaps it assumed that role. That is certainly what Mr. Abraham was urging Your Honors to accept, but those aren't the facts alleged in the complaint. Can I clarify my question? It wasn't whether the real estate broker was sued, but in this transaction, did Palmer also have a real estate broker or was he acting on his own? I assume he had a real estate broker. It's not alleged. He certainly had every right to have one. He doesn't allege that he didn't have one. I think we can presume from the ordinary course of events that he would have had one. I was just thinking in the course of home buying over the years how the home buying transaction works vis-à-vis a lender, and I don't think I've ever dealt directly with a lender. I'm just thinking that's the usual practice with E-Trade, is that how it works? E-Trade is a direct lender, so yes, it would ordinarily deal directly with a borrower, not through a broker. But it wouldn't help a buyer buy a piece of property. That's a wholly different transaction. That's my point. And the other point I wanted to make about context is you have to read what the E-Trade people said to Mr. Palmer in relation to what Mr. Palmer said to them. He did not say, to put it plainly, he did not exhibit to them the level of candor that he wants them to have displayed to him. He did not say to them, I am worried. Hang on. I think Judge Fletcher has a question. I'm sorry. Did not he say to them, I am a first-time buyer. Do I need another appraisal? Exactly. He said those words. But that does not halfway indicate what he now says he was really concerned about. It wasn't, I don't know how this thing works. You know, please explain the process to me. That's what he alleges he said in his complaint. In his complaint, that's what he alleges he said. What he really meant apparently was, I am worried I offered to pay too much. Now, in that context, I'm worried I offered to pay too much. Tell me I didn't pay too much. If he had said those words, yes, then I think you could reasonably say that you don't need an appraisal of your own, could be said to be the kind of representation that Mr. Abraham was urging to you it was in this case. But that isn't the context in which those words were uttered. They were uttered in terms of, I don't understand what the loan process is about. Do I need an independent appraisal? In that context, the words could not reasonably mean, the appraisal will inform you that the sale price you offered was reasonable. Lenders don't do that. Appraisals for lenders don't do that. Well, usually don't. Lenders won't make a mortgage loan unless the home comes in after the appraisal at an amount that is at or equal to the loan. Exactly. Exactly. That was Neimark's point, that appraisal is for the benefit of the lender. It is to assure the lender that its security is adequate for the amount lent. It is not for the purpose of assuring the buyer that he hasn't paid too much for the property. And all of Mr. Palmer's statements, he made three statements, and you can find them in paragraphs 14, 16, 17, and 21 of the complaint. He said, the sale price is 475. It's contingent on financing. I'm a first-time home buyer. I don't understand. I'm unfamiliar with the loan process appraisal and escrow. And his third to Mr. Aguilar was, please repeat what you said about the appraisal. Now, out of that context, how is a lender supposed to understand that it is being asked, does your appraisal tell me my sale price isn't too high? I submit that you simply can't. It's unreasonable to interpret the words that were said, which is, no, no, no, you don't need an appraisal. No, you shouldn't get an appraisal. I mean, in answer to the should I get an appraisal, no. And the appraisal came in okay, fine. It appraised for the sale price. All of those are vague statements that, in relation to a financing transaction, were absolutely perfectly true in the context in which they were spoken. And they're being twisted out of context because now Mr. Palmer is trying to say what he didn't tell the lender, which is, I want you to tell me if I pay too much for this property. All right, that was point one. The second point, there are two causes of action alleged in the Second Amendment complaint. One is for intentional misrepresentation, fraud, and the other is for negligent misrepresentation. And I mention that because, though we've gotten off on an entirely different course, they're very different causes of action. Negligent misrepresentation requires a positive assertion of fact. It cannot be based on an implied representation or an inference from what is actually said. And the cases on that are Dedecker v. Peel Financial, 60 Calab Fourth, 288 at 297-298. Apollo Capital Fund v. Roth Capital Partners, 158 Calab Fourth, 226 at 243. Here, if you look at the words that were actually said, all of them were absolutely true or were matters of opinion. It is only the implications of those words that Mr. Palmer tries to twist into some misstatement. Counsel, can it be a misstatement if you make a true statement, but it's not completely responsive to the question asked? Well, I think what you're getting at, Your Honor, is the misleading half-truth doctrine. Right. And, yes, of course, there can be fraud based on a misleading half-truth. It's not that it doesn't – it isn't responsive to the question, but rather that what is said is only half-truth and misleading in what is said. I think it's very different from does it directly answer the question. It's not fraud to say in response to a question some non-responsive answer, you know, just like you can't get perjury for a non-responsive answer. But, anyway, that is not what's alleged here. You're out of time. Let me see if that's answered Judge Fletcher's question. That's adequate. Okay. Thank you. Thank you very much, Mr. Chilton. Thank you. Mr. Abraham, back to you. You have about two minutes and a half left. See what I can do. Your Honor, I would direct the Court's attention to the record of page 4, paragraph 14. Counsel speaks greatly of the specific – What is that? What are you referring to? I'm sorry. That's the Second Amended Complaint. Right. It was at AER004. Yes. Paragraph 14 of the Second Amended Complaint. Plaintiff informed Mr. Tran that contingent on fining meant he did not need – did not have to complete the sale if the appraisal came back below the offer price. Mr. Palmer could not have been more clear that price and valuation were of concern to him. In that regard, to sit back here now and say all he was asking about is the process – Let me just read that sentence out loud here. That contingent on financing meant he did not have to complete the sale if the appraisal came back below the offer price, and he could not obtain financing for the purchase. What's your import of that? The point here is that what counsel had suggested was that Mr. Palmer was only interested in understanding process. In fact, he was interested in understanding the consequence of the actions that were being taken, not just how an appraisal was done or who selects the person that does it, but what in fact happens within that appraisal and what it means to have an appraisal that, by the way, in this case, was the product of e-trade. But isn't it true that all the lender cares about is that the appraisal comes back at an amount that's higher – equal to or higher than the loan? In fact, that's not all that the lender can care about. And what was very important in this case was that the lender showed the appraiser the transactional documents and said, here go your appraisal. Of importance, the sales price was on it. What is the – that was also a legitimate complaint. Forgive me, Your Honor. I didn't have that point page indicated, and I apologize for that. It's important that a lender have an appraisal that's higher, but it must be an accurate appraisal. And in that regard, the other comment that was made by counsel was that all that is cared about is the fact of the – I'm sorry, that in the context of this appeal, all that's relevant are the representations and that this is insufficient for the intentional misrepresentation only speaks to half the case. Remember, this was a 12 v. 6. We're not even at 5 percent of the case. The point is that the totality of the inaccurate statements begin with the statement from Mr. Tran. And assuming you get past the pleadings, those statements by E-Trade are continued in the appraisal. So we never reached the question of whether or not the appraisal was deliberately crafted to mislead. Thank you, Mr. Ecker. Mr. Chilton, thank you. Thank you, Your Honor. Good morning, gentlemen. 10-55688, Equatorial Marine Field Management v. MISC, Burhat. Each side will have ten minutes.
judges: Fletcher, Silverman, Wardlaw